IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

MICHAEL RECK,                          )
                                       )
    Plaintiff,                        )
                                       )
    v.                                )        Case No. 16-cv-1141-RJD
                                       )
WEXFORD HEALTH SOURCES, INC.,          )
JOHN TROST, TONYA SMITH, and GAIL      )
WALLS,                                 )
                                       )
    Defendants.                       )

## MEMORANDUM AND ORDER

**DALY, Magistrate Judge:**

Plaintiff Michael Reck, an inmate in the Illinois Department of Corrections ("IDOC"), brings this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. Plaintiff alleges several medical providers at Menard Correctional Center ("Menard") were deliberately indifferent to his serious medical needs. Plaintiff is proceeding on the following claims:

> **Count 1:** Eighth Amendment deliberate indifference claim against Wexford, Walls, and Trost for implementing, monitoring, and overseeing an ineffective sick call system;
>
> **Count 2:** Eighth Amendment deliberate indifference claim against Wexford, Walls, and Trost for understaffing and failing to fulfill necessary positions within the prison medical system;
>
> **Count 4:** Eighth Amendment deliberate indifference claim against Wexford, Trost, and Smith for failure to place Plaintiff in the chronic care clinic and on an individualized treatment plan;
>
> **Count 5:** Eighth Amendment deliberate indifference claim against Dr. Trost for delaying his referral of Plaintiff to a GI specialist despite having diagnosed the need for such referral.

Defendants Trost and Wexford filed a motion for summary judgment (Doc. 150) arguing Dr. Trost was not deliberately indifferent to Plaintiff's medical needs and Plaintiff has no evidence Wexford had an unconstitutional policy, practice, or procedure that caused a constitutional violation. Defendants Walls and Smith filed a motion for summary judgment (Doc. 152) arguing Walls had no personal involvement in Plaintiff's care and Smith was a nurse with no authority to direct Plaintiff's assignment to the general medicine chronic care clinic. Plaintiff filed a joint response under seal (Doc. 158).

As an initial matter, Defendants Trost and Wexford filed a Motion to Strike (Doc. 160) Plaintiff's Exhibit 1 (disciplinary records of Dr. Trost) and Plaintiff's Exhibit 5 (excerpts of deposition testimony of Dr. Trost from *Thomas v. Wexford*, 15-cv-108-RJD). Plaintiff filed a Response (Doc. 165) and Defendants filed a Reply (Doc. 168). Defendants assert Trost's disciplinary records constitute inadmissible hearsay and are improper character evidence. Plaintiff argues the statements within the disciplinary records are not hearsay because they are statements of an opposing party – Wexford, and, assuming arguendo, any statements found in the disciplinary letters are hearsay, they constitute exceptions to hearsay. Plaintiff further argues Defendants offer no explanation as to how or why this contemporaneous documentary evidence of Dr. Trost's behavior is prejudicial or improper. The Court agrees and denies Defendants' motion to strike Exhibit 1.

Defendants assert Exhibit 5 should be stricken because Plaintiff failed to disclose the deposition testimony during discovery. Plaintiff argues he had no discovery obligation to alert Defendants to the existence of Dr. Trost's deposition testimony in a prior case of which Defendants and Defendants' counsel were already aware. Again, the Court agrees. Plaintiff was under no obligation to disclose the existence of deposition testimony given by Defendant Trost himself.

Trost and Wexford were already aware of the deposition testimony. Further, Trost was represented in *Thomas v. Wexford* by Cassiday Schade, LLP, the same firm that currently represents Defendants Wexford and Trost. Federal Rule of Civil Procedure 32 expressly allows the use of deposition testimony in the manner in which Plaintiff has used it. Defendants' motion to strike Exhibit 5 is denied.

## FACTUAL BACKGROUND

On March 6, 2014, Plaintiff was transferred to Menard (Doc. 151-11 at 2). Dr. Trost was employed as Medical Director at Menard from November 25, 2013 to March 17, 2017 (Doc. 151-3). Since May 16, 2011, Wexford Health Sources, Inc. ("Wexford") has contracted with the State of Illinois to provide certain medical services to inmates within IDOC, and specifically at Menard (Doc. 151-D).

Plaintiff's Personal Records

Plaintiff testified at his deposition that when he would submit a sick call request, he would make an identical copy of the request and keep it for his own records (Plaintiff's Deposition, Doc. 151-2 at 28, 31). Plaintiff's records include sick call requests dated July 10, July 14, July 19, August 10, August 18, September 14, and September 20, 2015, seeking medical assistance for rectal pain, inflammation, and a possible infection (Doc. 158-6). Plaintiff also testified he kept a journal documenting certain events, including filing sick call slips and medical visits (Doc. 151-10). Plaintiff's journal includes entries documenting that he filed sick call requests on July 10, July 19, August 10, August 18, September 14, and September 20, 2015 (Id. at 4). Plaintiff testified as follows regarding submission of the sick call requests: "I write them on a half sheet of paper, place them in the bars, which they pick up at 11:00 p.m. or so, in the mail pass, when they come to collect the inmate mail" (Doc. 151-2 at 9). When asked who picks up the sick call

requests, Plaintiff testified, "Usually an officer on the third shift," not medical staff (Id.). Plaintiff testified that locked boxes were available at the end of the gallery but that he placed his sick call requests in the bars to be picked up by correctional staff (Id. at 26). Plaintiff testified he also informally notified various Menard staff members of his medical condition and requested medical assistance on multiple occasions (Doc. 151-2 at 26).

Plaintiff's Medical Records

On July 26, 2015, medical staff was in receipt of an undated request from Plaintiff stating, "I have been having scrotal pain, redness, and some mild swelling. The skin is extremely sensitive to touch and feels like being rubbed with sand-paper. Please help, this has been going on for about two weeks with no let up in symptoms" (Doc. 151-15 at 6). There is a notation, "Refer to MDCL" (Id.). According to Menard Sick Call Logs, Plaintiff was seen the next day by an RN on July 27, 2015, during nurse sick call for testicular pain (Doc. 151-14 at 1). The noted plan was to refer Plaintiff to DR/PA/NP (Id.). Plaintiff's medical records do not show that he was scheduled for an appointment to see a physician or NP until September 1, 2015 (Doc. 151-2 at 11, Doc. 151-1 at 1-6). In response to a grievance filed by Plaintiff later in September, Defendant Walls noted that "there was one kite in your medical file and Medical Records said you were scheduled but there was a computer glitch" (Doc. 153-2).

On September 1, 2015, Plaintiff saw Dr. Trost who noted that Plaintiff had a history of Crohn's disease and was last prescribed Humira (biologic medication used to treat Ulcerative Colitis) in 2011 (Doc. 151-1 at 6). Trost noted Plaintiff has had a fistula (abnormal connection between two hollow spaces) for one month and has a history of a fistulotomy (surgical procedure to treat fistulas) (Id.). Trost documented a fistula on Plaintiff's left buttock (Id.). Trost prescribed Levaquin 750mg (antibiotic) for 14 days and Pentasa 750mg (anti-inflammatory

medication that treats Ulcerative Colitis) for six months and ordered a one-month follow-up appointment (Id.). The following day, Plaintiff saw RN Smith complaining that "it's leaking now" (Id.). Smith noted the area was assessed the day prior by Trost and the left buttock was now draining (Id.). She noted alteration in skin integrity and instructed Plaintiff to keep the area clean and dry and gave him gauze (Id.). Defendant Smith testified she did not do an additional assessment on 9/2/15, but noted that Dr. Trost assessed Plaintiff the day before on 9/1/15 (Doc. 151-5 at 26).

On September 12, 2015, Plaintiff saw a non-party RN complaining that "it busted again" and self-reported that his fistula opened up (Doc. 151-1 at 7). The RN examined Plaintiff and did not observe any active draining, but noted an open area approximately 1 cm by 1 cm that was "beefy red" (Id.). Additionally, the RN noted Plaintiff was taking Levaquin and that he was scheduled to see Trost in three weeks (Id.). Plaintiff was instructed to keep the area clean and dry and provided gauze and band-aids (Id.).

On September 17, 2015, Plaintiff saw RN Smith and complained that he needed to have surgery "on this" (Doc. 151-1 at 9). Smith noted Plaintiff complained of constant rectal bleeding related to a fistula and reported that he had a history of fistula with surgical repair (Id.). Smith documented Plaintiff's skin was warm and dry, his color was natural, and his respirations were even and unlabored (Id.). Plaintiff complained of frequent dressing changes related to rectal bleeding and RN Smith provided gauze and referred him to a physician (Id.). Smith testified she did not perform an examination of Plaintiff's buttocks on that date (Doc. 151-5 at 27).

On September 24, 2015, Plaintiff saw a non-party RN for "boils" on his left buttock (Doc. 151-1 at 10). He reported that the boil drained with "white stuff" (Id.). The RN took his vitals and noted the boil on his left buttock was the size of a nickel (Id.). The RN examined Plaintiff

and noted there was no drainage seen and that the area looked like a healed boil (Id.).   The RN instructed Plaintiff to cleanse gently with antiseptic soap (Id.).   A notation was made to "check to see if in for follow up" (Id.).   The RN further instructed Plaintiff on hygiene and symptoms of cellulitis and told him to return to sick call if those symptoms occurred or if the pain worsened, new boils appeared, or he developed a temperature (Id. at 11).

On September 27, 2015, a non-party Correctional Medical Technician ("CMT") documented Plaintiff was scheduled on the physician call line from Nurse Sick Call, but the physician did not show and Plaintiff was not seen, so the CMT made a notation to recall Plaintiff (Doc. 151-1 at 12).   In Plaintiff's September 27, 2015 journal entry, he noted "Med Pass for Dr. Butalid – Never called (MD No Show)" (Doc. 151-10 at 5).

On October 2, 2015, Plaintiff saw Dr. Trost (Doc. 151-1 at 12).   Plaintiff's vitals were taken and Trost noted Plaintiff's fistula persisted, his last colonoscopy was in 2012, and he was prescribed Humira in 2011 (Id)   Trost noted there was no improvement and prescribed Levaquin 750mg for 14 days and referred Plaintiff to Collegial Review for a G.I. consultation (Id.).   Plaintiff was also prescribed ibuprofen 800mg to be taken three times per day as needed for one month (Id. at 55-56).   There is a dispute between Plaintiff and Defendant Trost as to whether Trost "examined" Plaintiff on October 2, 2015.   On that date, Trost completed two Medical Special Services Referral and Reports (Id. at 27-28).   The first was for Plaintiff to be sent to a gastroenterologist ("G.I.") for a colonoscopy.   In the rationale he noted Plaintiff had uncontrolled Crohn's disease and his last colonoscopy was in 2012 and he was prescribed Humira in 2011 with good result (Id. at 27).   The second was for a consultation with a gastroenterologist for an anal fistula and his rationale noted Plaintiff had Crohn's disease and a non-healing fistula (Id. at 28).

On October 9, 2015, Trost's referral for a diagnostic colonoscopy was approved (Doc. 151-

1 at 29).   On October 19, 2015, Plaintiff saw RN Smith requesting supplies for his draining fistula (Id. at 13).   She noted Plaintiff had drainage with his fistula and she provided triple antibiotic ointment and gauze (Id.).   Smith instructed Plaintiff to drink plenty of fluids and to use stool softeners and she also noted Plaintiff was awaiting Collegial approval (Id.).   On October 29, 2015, Trost presented Plaintiff to Collegial Review for a G.I. consultation and noted in the medical record the request was approved (Id. at 14).

On November 2, 2015, Plaintiff saw Smith and asked when he would "get this taken care of" (Doc. 151-1 at 15).   Plaintiff complained of rectal bleeding with fistula and hemorrhoid signs and symptoms (Id.).   Smith issued him gauze, noted he had hemorrhoids, and instructed him to keep the area clean and dry (Id.).   Smith testified she did not examine Plaintiff's buttocks (Doc. 151-5 at 31).   On November 4, 2015, Plaintiff saw a non-party RN who noted Plaintiff self-reported he was out of ibuprofen and antibiotics and had a history of bleeding fistula (Doc. 151-1 at 15.).   Plaintiff requested ibuprofen and antibiotics (Id.).   The RN called Trost who gave telephonic orders prescribing ibuprofen 800mg to take three times a day for 2 months and Levaquin 750mg for 14 days (Id.).   Also, on November 4, 2015, the gastroenterologist consultation was documented approved by Wexford Utilization Management (Id. at 30).

On November 5, 2015, Plaintiff saw a non-party RN who provided instructions for preparation for his colonoscopy the following day (Doc. 151-1 at 16).   On November 6, 2015, Plaintiff left Menard on medical furlough for his colonoscopy (Id. at 17).   Dr. Leyland Thomas performed Plaintiff's colonoscopy at Touchette Regional Hospital in Centreville, Illinois (Id. at 31-41).   Thomas took three biopsies of the large intestine, two of which came back normal and one came back with focal active colitis with no dysplasia or malignancy.   Thomas documented these results were consistent with focal mildly active Crohn's disease (Id. at 40).   Thomas noted

Plaintiff had a couple of dimpled areas on the perianal skin suggestive of fistula openings (Id. at 39). Plaintiff returned from medical furlough on the same date with no complaints of pain or bleeding (Id. at 18).

On November 9, 2015, the Medical Furlough Clerk noted that Plaintiff was scheduled for his G.I. consultation for Crohn's disease and his non-healing fistula (Doc. 151-1 at 19). The clerk noted that Dr. McCain's first available appointment was December 24, 2015 (Id.).

On November 16, 2015, RN Smith did not see Plaintiff but noted a request was sent in for a follow-up for his colonoscopy (Id. at 20). Plaintiff self-reported that his bleeding continued with his fistula/abscesses and that he had a pain of 8 out of 10 (Id.). Smith referred Plaintiff for a follow-up with a physician for the colonoscopy results and issued supplies (Id.). Also, on November 16, 2015, Plaintiff saw non-party physician Dr. Siddiqui, for his two-year physical exam (Id. at 59-61). Siddiqui noted Plaintiff had Crohn's disease and Plaintiff refused a rectal exam (Id. at 61). Plaintiff disputes that he refused an exam. A non-party nurse also saw Plaintiff on November 16, 2015 and noted Plaintiff complained of a fistula or infected boil and complained of intermittent pain of 6 out of 10 and discharge (Id. at 62). The nurse noted Plaintiff was to be reviewed for collegial and referred him to a physician (Id.).

On November 17, 2015, it was noted Plaintiff was scheduled on the Nurse Practitioner call line for his medical furlough return, but there was no need to see Plaintiff because the medical furlough return appointment was already done on November 6, 2015 after his colonoscopy (Id. at 21). It was documented he would be recalled and could access sick call as-needed (Id.). On November 24, 2015, Plaintiff saw a non-party NP for a follow-up post-colonoscopy (Id. at 22). The NP noted a visual exam on Plaintiff's rectum and redness on buttocks (Id.). On November 28, 2015, a non-party RN noted Plaintiff was sent to the Emergency Room via ambulance for a

seizure (Id. at 23, 42-28). Plaintiff returned to Menard later that day and it was noted that the seizure was possibly psychogenic or fake and that Plaintiff was malingering (Id. at 25).

On December 24, 2015, Plaintiff saw gastroenterologist Dr. Mack McCain (Id. at 51-52). His assessment was that Plaintiff had Crohn's disease and a rectal fistula (Id. at 51). His impression was to restart Plaintiff on Humira and refer him to a surgeon to evaluate his perirectal fistula and infection, continue Cipro, and order tuberculosis skin test and blood work (Id.). On return to Menard, the NP ordered blood work and a tuberculosis skin test (Id. at 26).

On December 28, 2015, Trost submitted a Medical Special Services Referral and Report for Plaintiff for a general surgery consultation and the rationale for his referral was for evaluation/treatment of Plaintiff's anal fistula (Id. at 49). On December 31, 2015, Plaintiff requested renewal of his ibuprofen and Hytrin prescriptions (Id. at 64). The medical records state Plaintiff signed a refusal for nurse sick call (Id.). Plaintiff disputes that he refused to go to sick call. The CMT scheduled a physician or NP to renew his prescriptions (Id.).

On January 6, 2016, Trost presented Plaintiff at Collegial Review for the general surgery consultation (Doc. 151-1 at 65). The general surgery consultation was approved on January 8, 2016 (Id. at 50). On January 10, 2016, Plaintiff was approved for Humira injections (Id. at 63, 65). On January 11, 2016, a non-party RN noted Plaintiff was scheduled on the physician call line for a follow-up but was not seen because Dr. Lochard was not present that day (Id. at 66). Plaintiff was to be recalled (Id.). On January 17, 2016, Plaintiff was scheduled again for the physician call line for renewal of his medications (Id. at 67). Plaintiff was not seen because the call line was out of time and he was recalled (Id.). On January 19, 2016, Plaintiff's Humira prescription was changed to Cimzia (biologic used to treat Crohn's disease) per Dr. McCain and the pharmacist at Boswell Pharmacy (Id.). On January 24, 2016, Plaintiff saw a non-party

physician and was prescribed Hytrin 8mg for one year and Motrin 800mg to be taken 3 times a day for 3 months (Id. at 124).

On January 28, 2016, Plaintiff saw Dr. Satyadeep Bhattacharya for a general surgery consultation (Doc. 151-1 at 126-129).   Bhattacharya noted Plaintiff was there for a referral for an anal fistula, he had multiple episodes with procedures performed in the past, and complained of intermittent pain with bleeding and drainage (Id. at 126).   After a rectal examination, Bhattacharya noted there was no active drainage and no findings of an abscess (Id. at 129). Bhattacharya documented Plaintiff appeared to have developed recurrent anal fistula disease (Id). He recommended an anorectal exam under anesthesia with possible seton (stich used to aid the healing of fistulae) placement and possible drainage of abscess cavities (Id.).   Upon return to Menard, a non-party NP noted Plaintiff should continue to be followed per the gastroenterologist (Id. at 70).

On January 30, 2016, Plaintiff began his Cimzia injections with his second injection due February 13, 2016 (Doc. 151-1 at 72).   On February 2, 2016, Trost referred Plaintiff to general surgery for an exam under anesthesia with possible seton placement and I&D (incision and drainage) of a possible abscess (Id. at 125).   On February 3, 2016, Trost presented Plaintiff to Collegial Review for a general surgery referral (Id. at 71).   On February 5, 2016, Trost's referral to general surgery was approved.   On February 8, 2016, Plaintiff was admitted to the infirmary for medical furlough preparation for his surgery (Id. at 73-77).

On February 9, 2016, Bhattacharya performed an examination under anesthesia with debridement of perianal abscess (Doc. 151-1 at 130-131).   Bhattacharya performed a digital rectal exam and there was no obvious fistula noted upon palpation of the indurated areas in the perianal region (Id. at 131).   Exteriorly, there was no expression of drainage into the anal canal (Id.).

Bhattacharya excised a 2 cm by 2 cm area of skin and induration down through the skin and beyond known scar (Id.).   After removal, the area was irrigated and there was no drainage into the anal canal noted upon irrigation (Id.).   The wound was packed with sterile 1-inch packing stirps (Id.).

On February 9, 2016 at 4:00 p.m., Plaintiff returned to Menard from medical furlough and was seen by an RN (Doc. 151-1 at 78).   Plaintiff denied being in pain and Dr. Trost was called for orders (Id. at 78-79).   Trost telephonically ordered Plaintiff to be admitted to the infirmary with his dressings to be left in place until the morning evaluation (Id. at 78).   Trost prescribed Tramadol as needed for 24 hours (Id.).   On February 10, 2016, Plaintiff reported "I'm better" and there was no bleeding noted (Id. at 81).   On February 11, 2016, Dr. Trost saw Plaintiff in the infirmary and noted Plaintiff was comfortable, and the wound was okay (Id. at 83).   Trost ordered daily gauze dressing changes at the Health Care Unit ("HCU") until the wound healed (Id.).   Plaintiff was discharged to the cell house with a prescription for ibuprofen as-needed (Id.).   On April 12, 2016, it was noted that Plaintiff's left buttock was healed and his dressing changes were discontinued (Id.).

On February 13, 2016, Plaintiff received his second Cimzia injection with the next injection scheduled for February 27, 2016 (Doc. 151-1 at 85).   On February 15, 2016, Trost saw Plaintiff and noted that his wound had some purulent drainage and prescribed Levaquin 500mg for ten days (Id. at 86).   On February 19, 2016, Trost saw Plaintiff and noted that his wound looked much cleaner (Id. at 89).   On February 27, 2016, Plaintiff received his third Cimzia injection with the next injection scheduled for March 26, 2016 (Id. at 94).

On March 18, 2016, Plaintiff was scheduled for the physician call line, but refused to attend the visit and signed the refusal form (Doc. 151-1 at 105).   On March 26, 2016, April 23, 2016, Mary 21, 2016, and June 18, 2016, Plaintiff received injections of Cimzia (Id. at 112, 121, 122).

(Id. at 112).   On June 20, 2016, Trost ordered to release any and all medical holds on Plaintiff (Id. at 123).

Health Care Unit Administrator

Gail Walls was employed by IDOC as the Health Care Unit Administrator ("HCUA") at Menard from approximately July 2014 through October 2018, when she retired from IDOC (Doc. 153-1).   In her role as the HCUA, Walls was charged with overseeing the daily operations of the health care unit (Id.).   Walls did not personally deliver any medical care to any inmates in that role (Id. at 1).   Walls testified she only oversaw IDOC employees; she had no administrative authority over any Wexford employees (Id., Doc. 151-9).   Plaintiff disputes that Walls had no supervisory authority over Wexford employees.   Plaintiff asserts all nursing staff reported to the Nursing Supervisor, a position which HCUA Walls filled during the relevant period, from June 2015 to April 2016 (Doc. 151-9 at 13).   Additionally, HCUA Walls' position description indicates that she had direct supervisory authority over Wexford physicians and the position description does not differentiate between IDOC or Wexford staff (Doc. 158-13).

HCUA Walls and Dr. Trost mutually monitored the performance of medical staff and worked in tandem to administer healthcare at Menard (Doc. 151-4 at 27).   Dr. Trost was "the clinical authority for the facility itself," and had the "final say on any type of clinical issue regarding the patient" (Id. at 28, Doc. 151-8 at 6).   Wexford management, Dr. Trost, and HCUA Walls, among others, were on the Quality Improvement (QI) Committee and the Governing Body Committee at Menard (Docs. 158-4, 158-8).   Wexford and IDOC staff participated in monthly QI meetings (Doc. 151-8 at 19).   As members of the QI Committee, MD Trost and HCUA Walls were involved in outcome and process studies covering the sick call system and chronic clinics from May 2015 until April 2016 and monthly monitoring of practitioners, including MD Trost

(Doc. 158-2).

Walls monitored the contract with Wexford by calculating the numbers of contractually-required position hours that were unfilled each month (Doc. 153-1 at 1). This information was reported in the health care unit Monthly QI Meeting Agenda (Id.). Those same documents tracked other types of data used to monitor and assess the health care system at Menard, including, among other things, the number of inmates seen in chronic care clinics (Id.). Walls attested she did not have any authority to hire, discipline or terminate any employee, regardless of whether that individual was employed by IDOC or Wexford (Id.). She also attested she did not have any authority or oversight over the treatment decisions made by medical professionals (Id.). Plaintiff disputes that Walls did not have authority to discipline employees and cites the HCUA position description which states, "monitors staff functions to ensure that patient care and services comply with medical, professional, departmental and facility policies and procedures," "counsels staff regarding work performance," "prepares and signs performance evaluations," and "determines and recommends staffing needs" (Doc. 158-13 at 1, 3).

In instances where there was a vacancy in the director of nursing position or nursing supervisor positions, Walls likely would have filled in for some of the job duties of those positions (Doc. 153-1 at 2). There were three nursing supervisor positions at Menard (Id.). There was one director of nursing position and the director of nursing typically handled the scheduling of staff (Id.). Walls, or her designee, would respond to requests for information from Menard's Grievance Officer, the office that handles inmate grievances, when inmates submitted grievances concerning medical issues (Doc. 153-1 at 2).

On a date between September 23, 2015 and October 1, 2015, Counselor Susan Hill forwarded a grievance submitted by Plaintiff to Tamera Turner (Doc. 153-2 at 6-8). On October

1, 2015, Walls signed a memorandum responding to Plaintiff's grievance indicating Plaintiff was scheduled to be seen by Trost on October 1, 2015[1] (Id. at 5).

IDOC Procedures

Inmates can submit a sick call request ("kite") by placing it in a locked box at each cell house or handing it to another inmate or staff member for that person to place the kite in the locked box for them (Doc. 153-1 at 2). If an inmate elects to leave a sick call request in the bars or gives it to an officer or another inmate to deposit, there is a chance the sick call request will not be received by the HCU (Doc. 151-9 at 45). Inmates are allowed to leave sick call request in bars but it is more likely the request will be received by HCU, if the inmate places the request directly in the locked boxes supplied for that purpose (Id.). Nursing staff collect the kites submitted by inmates to the box (Doc. 153-1 at 2). The nurse who reviews the kites each day creates a record of the kite by entering the inmates' information on the cell house sick call logbook worksheet (Id., Doc. 151-14). After a nurse receives a kite, he or she will schedule the inmate to be seen (Id.). Plaintiff disputes that nurses always schedule an inmate to be seen upon receiving a request for medical attention. When an inmate is seen during nurse sick call, a nurse evaluates the inmate's issues to determine whether a referral to a physician or other medical provider is warranted (Id.).

Menard is designated as a maximum-security correctional facility (Doc. 153-1 at 3). As such, there are instances where the facility or certain sections of the facility are placed on "lockdown," meaning inmate movement is restricted (Id.). Often during lockdowns, non-emergent medical care is suspended to the movement restrictions in place (Id.). A lockdown does not prevent an inmate with an emergency health condition from receiving care (Id.). IDOC

_____

[1] The memorandum contains a hand-written correction stating the appointment was scheduled for October 2, 2015.

documents lockdowns in a monthly memorandum (Id., Doc. 153-3).

IDOC has Administrative Directives ("AD's") that regulate health care in all IDOC facilities (153-1 at 3). Additionally, Menard has Institutional Directives ("ID's") that are based on IDOC AD's but are specific only to Menard (Id.). AD 04.03.105 governs chronic care clinics within IDOC facilities (Doc. 151-12 at 1-4). The General Medicine Clinic for chronic illnesses not otherwise designated is held at a minimum of every six months, typically in May and November (Id. at 3). ID 04.03.103 governs offender health care services at Menard (Id. at 5-17). Upon his transfer to Menard in 2014, Plaintiff was not placed in the general medicine chronic clinic for Crohn's disease (Doc. 151-1). Plaintiff's medical record does not note whether his Crohn's disease was active at the time of transfer (Id.). Plaintiff was not placed in the general medicine chronic care clinic for his Crohn's disease in 2015 or 2016 (Id.).

Defendant Tonya Smith was and is currently employed by IDOC as a nurse at Menard (Doc. 151-5). As a nurse, Smith testified she does not and cannot place any inmates in a chronic care clinic (Id. at 20-21). Plaintiff disputes Smith does not have authority to place an inmate in clinic care. Plaintiff asserts that Menard ID 04.03.103 states "clinic care is arranged if the attending medical practitioner or other appropriate medical staff feels such care is indicated during his examination of the offender during call line appointments or sick call screening" (Doc. 151-12 at 7).

Wexford Staffing

████████████████████████████████████████████

████████████████████████████████████████    ███████

████████████████████████████████████████████

██████████████████████████████    Defendants deny that Dr. Trost's unscheduled departures

caused any delay in the triage of sick call requests allegedly submitted by Plaintiff. Cheri Laurent, then-Vice President of Operations, testified Dr. Trost's conduct "adversely impact[ed] the patients and patient care" and that Dr. Trost compromised Wexford's "means to be able to provide the care to the patients and also to meet our commitments to our contract" (Doc. 151-4 at 24, 42). Dr. Matticks, Regional Medical Director for Wexford, testified that the wardens at Menard were "concerned about [Trost's] ability to continue functioning in his role" and that he learned about Trost's absences from, among others, HCUA Walls (Doc. 151-8 at 23). Nurse Smith testified that MD Trost skipped work enough times that it was "noticeable" (Doc. 151-5 at 17). Dr. Trost testified that it was possible his early departures and absences could have affected the provision of healthcare at Menard from July through December 2015 by leading to delays in treatment, additional backlogs, and affecting inmates who were attempting to be seen but had not yet been scheduled (Doc. 151-3 at 20-22). Between July 2015 and October 2015, Dr. Trost missed 179 of his contractually obligated hours of work (Doc. 158-2 at 43, 62, 64, 82, 84, 104, 106, 124). Between July 2015 and October 2015, Trost failed to see 242 patients as scheduled because he failed to show (Id.).

Due to staffing vacancies, Dr. Trost was the only full-time physician seeing patients starting in July 2015 (Doc. 151-8 at 34). Between July and October 2015, Wexford had unfilled contractual hours totaling 2,267 hours for its MD, physician, nurse practitioner, and registered nurse positions combined (Doc. 158-2 at 62, 82, 104, 124). According to then-VP of Operations Laurent, whenever there are unfilled positions "there's going to be a greater need for the [medical director] to be providing direct services" (Doc. 151-4 at 31). Wexford was consistently 1.5 physicians short of meeting its contractual obligations during the relevant period (Doc. 151-8 at 44, Doc. 158-2 at 145).

Dr. Trost testified at his deposition in *Thomas v. Wexford et al.*, No 3:15-cv-00108-RJD, regarding the topic of physician staffing vacancies and stated he had multiple conversations with Dr. Matticks and Yolanda Johnson (Doc. 158-5 at 3). Asked about the nature of the issue he raised with his superiors, he stated:

> Well, just that, at I shared with you, the site is a large one. As you said, it's a busy one. A lot of inmates. There's a lot of chronic illnesses as well as acute illnesses that just, you know, to get back to full strength would be in the best interest of practice, you know?
> It's – I mean, you can do what you can for some time, but it's something that ultimately, the site, I believe, was supposed to be staffed by three physicians and two nurse practitioners, and I think that was the quota of whatever you would call it.

(Id). Asked about his reaction when Wexford could not fill physician and nurse practitioner positions:

> As I said, there's a limited amount of time in a day, and there are a lot of inmates, and there are a lot of medical problems that need to be tended to, both acute and chronic. And as a physician, you know, I took an oath and I take that very seriously to always provide the best care that I could provide, and it just would cause concern that that wouldn't be possible under the circumstances. I mean you didn't want to see anyone not receive the care that they needed.

(Id. at 4).

Wexford Audit

Between July and September 2015, Wexford conducted an audit and rated its operations at Menard (Doc.158-9). ██████████████████████

██████ ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ █████████████████████████████████

█████████████████████ ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████

## LEGAL STANDARD

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). In determining a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

The Eighth Amendment protects inmates from cruel and unusual punishment. U.S. Const., amend. VIII; *see also Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010). As the Supreme

Court has recognized, "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on such a claim, the plaintiff must first show that his condition was "objectively, sufficiently serious" and second, that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted).

The following circumstances are indicative of an objectively serious condition: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); *see also Foelker v. Outagamie Cnty.*, 394 F.3d 510, 512-13 (7th Cir. 2005).

An inmate must also show that prison officials acted with a sufficiently culpable state of mind, namely deliberate indifference. Put another way, the plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. A plaintiff does not have to prove that his complaints were "literally ignored," but only that "the defendants' responses were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes,* 546 F.3d at 524 (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)). Negligence, gross negligence, or even recklessness as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823, F.2d 1068, 1072 (7th Cir. 1987). Also, "mere disagreement with the course of the inmate's medical treatment does not constitute an Eighth Amendment claim of deliberate indifference. *Snipes v. DeTella*, 95

F.3d 586, 591 (7th Cir. 1996).

When a private corporation has contracted to provide essential government services, such as health care for inmates, the corporation cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself. *Shields*, 746 F.3d at 789; *see also Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Accordingly, in order for a plaintiff to recover from a private corporation, he must offer evidence that his injury was caused by a corporate policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy. *Id.* at 796. He must also offer evidence showing that the policymakers were aware of the risk created by the custom or practice and failed to take appropriate steps to protect him. *Thomas v. Cook County Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009).

## DISCUSSION

Defendants do not dispute Plaintiff suffers from Crohn's disease or that his anal fistula constituted a serious medical need. In dispute is whether each Defendant acted with deliberate indifference to Plaintiff's serious medical needs.

*Count 1 – Ineffective Sick Call System (Walls, Trost, & Wexford)*

Plaintiff argues the sick call system was ineffective because he alleges he submitted multiple sick call requests in July and August, but was not seen. Plaintiff asserts medical staff failed to log his sick call requests, and that he was not seen by medical staff when his requests were logged.

The record indicates medical staff received one sick call request from Plaintiff on July 26, 2015. Plaintiff asserts that he was not seen in response to that request. The evidence in the record, however, indicates otherwise. The Menard Sick Call Log from July 27, 2015, indicates

Plaintiff was seen by an RN during nurse sick call for testicular pain. It was noted on the sick call log that Plaintiff would be referred to a physician/NP. There is no dispute that referral did not immediately happen. The evidence shows there may have been a failure to schedule Plaintiff for an appointment with a physician after such referral was recommended by a nurse, however, there is no evidence of a failure of medical staff to respond to a received sick call request.

Aside from the July 26, 2015 request, Plaintiff has failed to set forth any evidence the other sick call requests he alleges he submitted in July and August 2015, were received by health care staff. Plaintiff testified he placed those requests "in the bars" to be picked up by security staff. The record indicates if an inmate chooses to place a request in his cell bars rather than directly in the locked box dedicated for that purpose, it is less likely the request will be received by medical staff. Plaintiff has no evidence of which security staff retrieved those requests or whether security staff properly delivered the requests to the locked box or to medical staff. There is no evidence medical staff failed to log, or respond to, sick call slips that were received by the health care unit. Notably, a copy of the July 26, 2015 request received by medical staff was not included in the "contemporaneous handwritten copies" of sick call requests maintained and presented as exhibits by Plaintiff. Further, Plaintiff's journal does not contain an entry regarding a sick call request submitted on July 26, 2015. It is clear Plaintiff handled the submission of the July 26, 2015 request differently than the other requests included in his records.

Plaintiff has failed to set forth sufficient evidence that an ineffective sick call system resulted in deliberate indifference to his serious medical needs. In fact, the record shows that when the sick call request was received by medical staff, Plaintiff was scheduled to be seen by a nurse the following day. To the extent Plaintiff's claim asserts Defendants are responsible for any alleged failure of the non-party sick call nurse to refer Plaintiff to a physician, *respondeat*

*superior* liability does not apply to prison officials or to a private corporation under § 1983. Defendants Wexford, Walls, and Trost are entitled to summary judgment on Plaintiff's Count 1 claim regarding an ineffective sick call system.

*Count 2 – Inadequate Staffing (Walls, Trost, & Wexford)*

Plaintiff asserts treatment for his condition was delayed because of physician staffing deficiencies at Menard. Plaintiff specifically asserts Defendant Wexford had a practice, policy, or procedure of understaffing and failing to fulfill necessary positions within the prison medical system and Defendants Walls and Trost were aware of, and responsible for, the failure to address staffing vacancies.

Plaintiff's brief sets forth in great detail the physician staffing deficiencies at Menard in 2015 and 2016, including Dr. Trost's failure to work his scheduled shifts. Based on the evidence in the record, it is clear Defendants Walls, Trost, and Wexford were aware of staffing vacancies during the relevant time period. It is documented by the Quality Improvement Committee and Wexford's own internal audit, as well as acknowledged by Dr. Matticks and Ms. Laurent, that Menard had vacancies for physicians during the time period of Plaintiff's complaints. However, while there is evidence in the record Defendants Walls and Trost had administrative responsibilities and were responsible for monitoring health care services at Menard, there is no evidence that either Walls or Trost had authority to hire additional staff.

Moreover, there is no evidence in the record that Plaintiff's care was delayed due to the staffing issues. Plaintiff alleges he submitted multiple requests in July and August, but as discussed above, there is no evidence those requests, aside from the request dated July 26, 2015, were received by medical staff. While Plaintiff was supposed to be referred to a physician on July 27, 2015 for testicular complaints, there is no evidence that referral ever happened. Plaintiff

also made clear during his deposition that he was not blaming Dr. Trost for any delays in his treatment prior to September 1, 2015, because the nurses did not schedule him to see Trost prior to that date (Doc. 151-2 at 6, 9).   Any delay in Plaintiff's treatment in July or August 2015 was not the result of physician staffing deficiencies, as there is no evidence Plaintiff was ever scheduled for an appointment to see a physician.

There is also no evidence Plaintiff's care after he was scheduled to see Dr. Trost was unreasonably delayed due to any physician staffing deficiencies.   The Court notes there is ample evidence Trost was failing to report for all of his scheduled shifts in 2015 and 2016.   However, there is no evidence Trost's failure to show ever affected Plaintiff.   Plaintiff was seen by Dr. Trost on September 1, 2015, and then had at least four more visits with medical staff in September. There is a notation in Plaintiff's medical records that he was scheduled for an appointment with a physician on September 27, 2015 that was cancelled because the physician did not show. According to Plaintiff's own records that physician was Dr. Butalid.   The appointment was rescheduled with Dr. Trost and occurred five days later on October 2, 2015.   Plaintiff has presented no evidence rescheduling the appointment five days later had any negative impact on the treatment of his medical needs.   When Trost saw Plaintiff on October 2, 2015, he began the process of referring Plaintiff out to be seen by specialists.   Plaintiff's allegations regarding the timing of referrals will be addressed in Count 5.

Plaintiff has failed to set forth evidence that understaffing resulted in deliberate indifference to his serious medical needs.   Defendants Walls, Trost, and Wexford are entitled to summary judgment on Plaintiff's Count 2 claim of deliberate indifference.

*Count 4 – Failure to place in chronic care clinic (Smith, Trost, & Wexford)*

Plaintiff asserts Dr. Trost and Nurse Smith were deliberately indifferent to his serious

medical needs because they failed to place him in a chronic care clinic once they learned of his Crohn's disease and they failed to apply an individualized treatment plan specific to Plaintiff's needs throughout his care. Further, Plaintiff asserts Trost and Smith failed to conduct an actual examination at each of his visits and failed to adequately follow up knowing he was chronically ill.

Defendant Smith asserts the Administrative Directive that defines the general medicine clinic states that the clinic shall be held at a minimum of once every six months. Smith argues Plaintiff was seen six times between September 1, 2015 through October 2, 2015, and that there are no facts that suggest Plaintiff suffered any harm due to his lack of assignment to the general medicine clinic. Additionally, Smith argues she does not and cannot place inmates in chronic care clinics. Finally, Smith asserts whether she visually examined Plaintiff's anal fistula/abscess on each occasion is irrelevant as Plaintiff did not suffer any harm as a result of her failure to do so.

Plaintiff has failed to set forth evidence that Defendant Smith actually had authority to place him in a chronic care clinic. Additionally, there is no evidence Smith's failure to visually examine Plaintiff's anal fistula at every visit resulted in any harm to Plaintiff. Defendant Smith is entitled to summary judgment on Plaintiff's Count 4 claim of deliberate indifference.

Defendant Trost argues he was not deliberately indifferent to Plaintiff's chronic condition of Crohn's disease. Trost asserts Plaintiff was seen throughout September and October 2015 much more often than he would have been had he been placed in the General Medicine Clinic which only required seeing patients every six months. Trost also asserts that every clinical encounter he had with Plaintiff included an "individualized treatment plan."

Defendant Wexford notes that if Dr. Trost was not deliberately indifferent for failing to place Plaintiff in a chronic care clinic, Wexford cannot be held liable because there is no

underlying constitutional violation. Wexford further argues that Plaintiff's own allegation that Wexford maintains clinics for inmates with chronic conditions contradicts his allegation that Wexford has a practice, policy, or procedure of denying access to care for inmates with chronic diseases.

Plaintiff has failed to set forth any evidence that the failure to place him in a chronic care clinic resulted in any harm. Further, Plaintiff's medical records indicate Trost did assess and document an individualized treatment plan when he saw Plaintiff. Mere disagreement with the treatment plan developed does not constitute an Eighth Amendment claim of deliberate indifference. Dr. Trost and Wexford are entitled to summary judgment on Plaintiff's Count 4 claim of deliberate indifference.

*Count 5 – Delay in Referral to G.I. Specialist (Trost)*

Plaintiff argues Defendant Trost delayed referring him to a G.I. specialist because Trost verbally promised Plaintiff that he would refer him to a gastroenterologist at the September 1, 2015 visit, but did not. Plaintiff further asserts Dr. Trost should have been aware conservative treatment had failed by October 2, 2015, and immediately referred Plaintiff for surgery, rather than referring him for a consultation with an outside gastroenterologist.

Plaintiff's expert, Dr. Hellerstein, opined Dr. Trost's prescription of antibiotics and Pentasa on September 1, 2015 was a reasonable course of action and satisfied the standard of care. Defendants' expert, Dr. Gage, agreed. It was Dr. Hellerstein's opinion that Dr. Trost should have then referred Plaintiff for a general surgery consultation on October 2, 2015 after conservative treatment had failed. He explained that Dr. Trost's referrals for a G.I. consultation and colonoscopy did not harm Plaintiff and they may have produced some additional information, but that Trost should have referred Plaintiff directly for a general surgery consult on October 2, 2015.

Dr. Gage opined that he would have made the same referral decisions as Dr. Trost by first trying safe conservative treatment, following the patient closely, and then referring him to a specialist if the conservative treatment was not successful. Specifically, Dr. Gage opined that surgery can be very painful, so it is generally avoided and reserved for cases which fail more conservative measures. Dr. Hellerstein testified that there can be different courses of management that remain consistent with the standard of care.

There is no dispute Dr. Trost's course of treatment prescribed on September 1, 2015 was within the standard of care. Further, Plaintiff has failed to set forth sufficient evidence that the decision of Dr. Trost on October 2, 2015, to refer Plaintiff to an outside gastroenterologist rather than directly to an outside surgeon, was such a substantial departure from accepted professional judgment, or so plainly inappropriate, as to permit the inference he intentionally or recklessly disregarded Plaintiff's medical needs. The record indicates on October 2, 2015, Dr. Trost submitted two Medical Special Services Referral and Reports on behalf of Plaintiff. The first was for a diagnostic colonoscopy and the second was for a gastroenterologist consultation. Plaintiff was approved for the colonoscopy on October 9, 2015 and the GI consultation on October 29, 2015. Once approved, the scheduler noted that the first available appointment for the GI consultation was December 24, 2015. Dr. Trost is not responsible for the any delay caused by the availability of the outside specialist. When Dr. McCain, the gastroenterologist, recommended on December 24, 2015, referring Plaintiff to a surgeon, Trost submitted the referral form four days later on December 28, 2015. Plaintiff was approved for surgery on January 8, 2016, and underwent surgery on January 28, 2016.

Plaintiff has failed to set forth any evidence that referring Plaintiff to a GI specialist rather than a surgeon on October 2, 2015 constituted deliberate indifference of a serious medical need.

Defendant Trost is entitled to summary judgment on Plaintiff's Count 5 claim of deliberate indifference.

CONCLUSION

The Motion to Strike (Doc. 165) is **DENIED**, the Motion for Summary Judgment (Doc. 150) filed by Defendants Trost and Wexford is **GRANTED**; the Motion for Summary Judgment (Doc. 152) filed by Defendants Walls and Smith is **GRANTED**; and the Clerk of Court is **DIRECTED** to enter **JUDGMENT** for Defendants Walls, Smith, Trost, and Wexford and against Plaintiff.

**IT IS SO ORDERED.**

**DATED:   July 9, 2019**

s/ *Reona J. Daly*

**Hon. Reona J. Daly**
**United States Magistrate Judge**